775 F.2d 627
 23 ERC 1452, 84 A.L.R.Fed. 895, 54
USLW 2248,
15 Envtl. L. Rep. 21,044
 ROLLINS ENVIRONMENTAL SERVICES (FS), INC., a Delaware
Corporation, Plaintiff- Appellant,
v.
The PARISH OF ST. JAMES, a political subdivision of the
State of Louisiana, et al., Defendants-Appellees.
 No. 85-3092.
 United States Court of Appeals,
Fifth Circuit.
 Nov. 1, 1985.
 
 William H. Lewis, Jr., David F. Tripp, Morgan, Lewis & Bockius, Washington, D.C., and Emile C. Rolfs, III, Robert L. Boese, Broadhurst, Brook, Mangham and Hardy, Baton Rouge, La., for plaintiff-appellant.
 Ridgway M. Hall, Jr., Crowell & Moring, Washington, D.C., for amicus, Hazardous Waste Treatment Council.
 Stephen M. Irving, Baton Rouge, La., for Parish of St. James.
 Peter M. Arnow, Asst. Atty. Gen., Environmental Enforcement Section, John B. Sheppard, Jr., Baton Rouge, La., for Patricia M. Norton, Sec., La. Dept. of Env. Quality.
 David C. Shilton, Martin W. Matzen, Atty., Appellate Section, Land & Natural Resources Div. Justice Dept., Washington, D.C., for U.S. E.P.A.
 Appeal from the United States District Court for the Eastern District of Louisiana.
 Before GOLDBERG, REAVLEY and GARWOOD, Circuit Judges.
 OPINION
 GOLDBERG, Circuit Judge.
 
 
 1
 This case presents a classic confrontation over the principles of federalism. Appellant Rollins has developed a national system of toxic waste disposal facilities and wishes to locate an intermediate processing plant in St. James Parish, Louisiana. No one contends in this case that Rollins' proposed and existing facilities, and its plans for operating them, do not conform to Congress' directives in the Toxic Substances Control Act and to applicable regulations issued by the Environmental Protection Agency. Nevertheless, the Parish, for reasons that are not difficult to comprehend, does not want this or any other toxic waste disposal facility located within its boundaries. After passing an ordinance that explicitly prohibited the type of toxic waste disposal at issue here, the Parish settled on a version that accomplished indirectly what the earlier ordinance set out to accomplish directly. The district court, Beer, J., found as a fact that the second ordinance amounted to an out-right prohibition of Rollins' activities, but decided ultimately that it lacked subject matter jurisdiction over the case. We hold that there was jurisdiction and conclude that the challenged ordinance has been preempted by the Toxic Substances Control Act.
 
 I. FACTUAL AND PROCEDURAL BACKGROUND
 
 2
 Plaintiff-appellant Rollins Environmental Services (FS), Inc. ("Rollins") is in the business of handling, transporting, and cleaning up hazardous wastes. This case arises from Rollins' proposed treatment of certain particularly toxic and deadly substances known as polychlorinated biphenyls ("PCBs") that are found, among other places, in the insulating fluid of large electrical transformers and capacitors. PCBs are carcinogenic agents, and direct exposure even to minute quantities of them can be fatal. For this reason Congress established in the Toxic Substance Control Act ("TOSCA") a broad range of programs to dispose of PCBs safely and to phase out their use. P.L. 94-469, 15 U.S.C. Sec. 2601 et seq. (1976).
 
 
 3
 In November, 1984, Rollins commenced PCB disposal operations at a facility located in Union, Louisiana, in the Parish of St. James. The site of the facility is about one-quarter mile from the Romeville Elementary School. Rollins planned to receive obsolete electrical transformers (some weighing several thousand pounds) at the facility by truck or rail, to drain off the fluid containing PCBs, and to rinse out the interiors of the transformers with diesel fuel. The insulating fluid and spent diesel fuel would then be placed in containers and shipped to another Rollins facility in Texas for final disposal; the transformers themselves were to be shipped to a landfill in Nevada for burial. 2 Record on Appeal, Transcript of Proceedings ("Tr.") at 88. This procedure was designed by Rollins as part of a national program for the safe disposal of PCBs. Rollins has decontaminated thousands of transformers in this way, as specified by EPA regulations, see 40 C.F.R. 761.40-761.79 (1984), and its Texas incinerator is one of only three in the nation approved for the destruction of large quantities of PCBs. Tr. at 91, 95-98, 100-06.[1]
 
 
 4
 The first shipment of transformers arrived at Rollins' Union, Louisiana, facility on November 27, 1984. On December 19, 1984, the St. James Parish Council enacted Emergency Ordinance 84-29, "An Ordinance Regulating Hazardous Wastes and PCBs in St. James Parish," which provided in part:
 
 
 5
 The treatment, storage, and disposal of polychlorinated biphenyls (PCB and PCB's) at commercial waste disposal facilities within the Parish of St. James is hereby prohibited.
 
 
 6
 The transporting of polychlorinated biphenyls (PCB and PCB's) through the Parish of St. James shall require that the transporting agent supply a manifest to, and obtain a permit from, the Sheriffs [sic ] Department of St. James Parish.
 
 
 7
 Two days later Rollins brought an action in the United States District Court for the Eastern District of Louisiana, challenging the Ordinance as violative of the Commerce Clause and Supremacy Clause of the U.S. Constitution and demanding declaratory and injunctive relief.
 
 
 8
 Ordinance 84-29 remained on the books for less than a month. At its next meeting, on January 2, 1985, the St. James Parish Council repealed Ordinance 84-29 and replaced it with Emergency Ordinance 85-1. Tr. at 19, 71. The new Ordinance is styled "An Ordinance Regulating Commercial Solvent Cleaning Businesses in St. James Parish," and it includes the following "prohibitions":
 
 
 9
 A. No commercial solvent cleaning business may be conducted within one mile of any area of special concern.
 
 
 10
 B. No commercial solvent cleaning business may be located in an area of special environmental concern or conducted so as to drain or discharge any spent solvent into any area of special environmental concern.
 
 
 11
 C. No commercial solvent cleaning business may conduct any part of the cleaning operation except in a "contained area" as described in this ordinance.[2]
 
 
 12
 Rollins amended its complaint to challenge Ordinance 85-1, and it is this Ordinance that is at issue in the present case.
 
 
 13
 A full hearing was held in the district court on Rollins' request for a temporary restraining order. Rollins put on four witnesses: the President of St. James Parish, a civil engineer and land surveyor, a member of the St. James Parish Council, and the Vice-President of Rollins. After hearing their testimony and the arguments of counsel, including that of an Environmental Protection Agency ("EPA") representative, the district court found as a fact that Ordinance 85-1 amounted to, and had the practical effect of, an absolute prohibition of Rollins' activities in the Parish. See Tr. at 137-38, 139, 145, 149-50, 154-55. Nevertheless, the district court determined that it lacked subject matter jurisdiction and dismissed Rollins' suit. The key factor in the court's decision seems to have been the EPA's ambivalent position on the issue of preemption. See id. at 83-85, 117-18, 150, 151, 152-53 (describing EPA administrator's statement as "essentially a punt"). Since the EPA did not unambiguously confirm that Ordinance 85-1 was preempted under TOSCA, the court was reluctant to disturb what it saw as an otherwise legitimate exercise of the Parish's political rulemaking and local police powers.
 
 II. JURISDICTION
 
 14
 The issue of jurisdiction is a threshold matter. Although some consideration of the merits may occasionally be necessary for a decision on jurisdiction, in this case the district court need not have looked very far to find jurisdiction.
 
 
 15
 The most obvious source of federal jurisdiction in this case is 28 U.S.C. Sec. 1331, which confers original jurisdiction on the district courts to adjudicate "all civil actions arising under the Constitution, laws, or treaties of the United States." In its amended Complaint Rollins invokes, inter alia, the Supremacy Clause of the U.S. Constitution, the Commerce Clause of the U.S. Constitution, and specific provisions of the Toxic Substances Control Act as bases for its claims. For a finding of federal question jurisdiction it is not incumbent on the party asserting jurisdiction to prove in advance that it will ultimately prevail on the merits of its federal claims. Bell v. Hood, 327 U.S. 678, 682, 66 S.Ct. 773, 776, 90 L.Ed. 939 (1946). Rather, the party asserting jurisdiction need only advance plausible, colorable claims that "arise under" federal law. As the Supreme Court stated in Oneida Indian Nation v. County of Oneida, 414 U.S. 661, 94 S.Ct. 772, 39 L.Ed.2d 73 (1974), for purposes of jurisdiction it is sufficient that a party present claims that are not "so insubstantial, implausible, foreclosed by prior decisions of this Court, or otherwise completely devoid of merit as not to involve a federal controversy ... whatever may be the ultimate resolution of the federal issues on the merits." Id. at 666-67, 94 S.Ct. at 777; see also SED, Inc. v. City of Dayton, 515 F.Supp. 737, 740-41 (S.D.Ohio 1981) (EPA's position on preemption of ordinance regulating PCBs irrelevant to issue of jurisdiction).
 
 
 16
 In this case it is clear that federal law supplies essential elements of Rollins' claims. First, Rollins asserts that Ordinance 85-1 regulates an area of concern that is expressly preempted under TOSCA, Sec. 18(a)(2)(B), and thus directly violates the Supremacy Clause of the U.S. Constitution. Second, Rollins maintains that Ordinance 85-1 conflicts with implied Congressional goals and purposes, expressed through enactments in the same field--namely, the comprehensive legislative and regulatory scheme enacted in TOSCA--and is thus unconstitutional under the implied preemption doctrine of the Supremacy Clause. Finally, Rollins alleges that the Ordinance constitutes a substantial burden on interstate commerce and thereby violates the Commerce Clause of the U.S. Constitution. Clearly, these claims are plausible enough and present sufficiently substantial federal questions to get Rollins into federal court.[3]III. SCOPE OF REVIEW
 
 
 17
 Ordinarily we would have no occasion to reach the merits of a case dismissed in federal district court for want of jurisdiction. In the present case, however, it is clear that the district court based its jurisdictional ruling on the merits of Rollins' federal claims. A brief examination of the record confirms this interpretation of the proceedings below.
 
 
 18
 At the outset of the hearing on Rollins' request for a temporary restraining order the district court directed counsel for both parties to focus their efforts on the "threshold" issue of jurisdiction. Tr. at 4-5. The court then proceeded to hear four witnesses, noting that "the whole question of preemption seems to require a certain amount of, I guess you would have to say, testimony on the merits...." Id. at 52. The witnesses testified in detail on such diverse subjects as the porosity of concrete, the location of a 1,000-year flood plain in St. James Parish, and the volume of water that would pass through an eight-inch water line at sixty pounds per square inch pressure during six hours of continuous use. At the end of this testimony, and after hearing the arguments of counsel, the district court concluded that, but for its perceived lack of jurisdiction, it would have found against the Parish on the merits. "[I]f I have jurisdiction," the district court stated,
 
 
 19
 then I would have to say to the very able and I think distinguished parish Council, you all are in trouble. Because I think as a factual matter, the result of your Ordinance, however well intended, however much was your feeling that that was the will of the people you are elected by, the fact of the matter is that it does effectively kick Rollins out of the Parish, insofar as this activity is concerned.
 
 
 20
 Id. at 154.
 
 
 21
 As will be more fully developed below, the purpose and effect of Ordinance 85-1 are the only real factual issues in this case. On these issues, the district court made explicit findings of fact. See id. at 137-38, 139, 145, 149-50, 154.[4]
 
 IV. PREEMPTION
 
 22
 The overall purpose of the Toxic Substances Control Act was to set in place a comprehensive, national scheme to protect humans and the environment from the dangers of toxic substances. Congress recognized that state and local ordinances might thwart the effectiveness of a national legislative and regulatory scheme; accordingly, section 2 of TOSCA states that "the effective regulation of interstate commerce in such chemical substances and mixtures also necessitates the regulation of intrastate commerce in such chemical substances and mixtures." 15 U.S.C. Sec. 2601(a)(3).[5]
 
 
 23
 Sections 2604 and 2605 of Title 15 are the basic provisions of TOSCA mandating a comprehensive regulatory scheme for toxic substances. Section 2605(e)(1) provides in part:
 
 
 24
 (e) Polychlorinated biphenyls.--(1) Within six months after January 2, 1977, the Administrator shall promulgate rules to--
 
 
 25
 (A) prescribe methods for the disposal of polychlorinated biphenyls, and
 
 
 26
 (B) require polychlorinated biphenyls to be marked with clear and adequate warnings, and instructions with respect to their processing, distribution in commerce, use or disposal or with respect to any combination of such activities.
 
 
 27
 To effectuate Congress' national regulatory objectives, Section 18(a)(2)(B) of TOSCA, codified at 15 U.S.C. Sec. 2617, contains an explicit preemption provision, which reads as follows:
 
 Preemption
 
 28
 ....
 
 
 29
 Except as provided in subsection (b) of this section--...
 
 
 30
 ....
 
 
 31
 ... if the Administrator prescribes a rule or order under section 2604 or 2605 of this title (other than a rule imposing a requirement described in subsection (a)(6) of section 2605 of this title) which is applicable to a chemical substance or mixture, and which is designed to protect against a risk of injury to health or the environment associated with such substance or mixture, no State or political subdivision of a State may, after the effective date of such requirement, establish or continue in effect, any requirement which is applicable to such substance or mixture, or an article containing such substance or mixture, and which is designed to protect against such risk unless such requirement (i) is identical to the requirement prescribed by the Administrator, (ii) is adopted under the authority of the Clean Air Act or any Federal law, or (iii) prohibits the use of such substance or mixture in such State or political subdivision (other than its use in the manufacture or processing of other substances or mixtures).
 
 15 U.S.C. Sec. 2617(a)(2)(B).[6]
 
 32
 In 1978 the EPA promulgated a comprehensive set of PCB disposal regulations pursuant to its authority under section 2605. See 43 Fed.Reg. 7150 (Feb. 17, 1978). These regulations have been codified at 40 C.F.R. Secs. 761.40-761.79 (1984). The Parish of St. James does not maintain that Ordinance 85-1 qualifies for any of the three above-numerated exceptions to the preemption provision. Subsection (b) details a procedure for obtaining exemptions from the preemption provision, but the Parish has not applied for such an exemption. Thus all the conditions necessary to trigger the preemption provisions of TOSCA have been met.[7]
 
 
 33
 Article VI of the U.S. Constitution provides that "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof ... shall be the supreme Law of the Land." It is well established that Congress may, within constitutional limits, absolutely preempt state and local rulemaking authority in a given area. Jones v. Rath Packing Co., 430 U.S. 519, 525, 97 S.Ct. 1305, 1309, 51 L.Ed.2d 604 (1977); Pacific Gas and Electric Co. v. State Energy Resources Comm'n, 461 U.S. 190, 203-04, 103 S.Ct. 1713, 1722, 75 L.Ed.2d 752 (1983). Even where Congress has not entirely displaced state and local rulemaking in a specific area, those lower laws are preempted to the extent that they conflict with federal law. Where a lower law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," Hines v. Davidowitz, 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941), it is preempted. Preemption may also be "inferred" from the existence of a comprehensive Congressional scheme covering an area of activity. Fidelity Federal Savings & Loan Ass'n v. de la Cuesta, 458 U.S. 141, 102 S.Ct. 3014, 73 L.Ed.2d 664 (1982); Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947). Here, however, Congress has explicitly mandated that TOSCA, and regulations promulgated under it by the EPA, preempt state and local regulation of PCB disposal.[8]
 
 
 34
 Against this legal background, appellee St. James Parish wisely declines to dispute the validity of Congressional preemption as a general proposition. The Parish acknowledges that an outright ban or prohibition of PCB disposal activity would be impermissible under TOSCA. See, e.g., Warren County, 528 F.Supp. at 290. However, in response to the foregoing analysis the Parish insists that its challenged Ordinance is not a PCB ordinance at all. There is no mention of "PCBs," "transformers," or "toxic substances" in Ordinance 85-1; instead, it refers exclusively to "commercial solvent cleaning" operations and the like. In other words, the Parish argues that its Ordinance does not regulate the same field of activity preempted by Congress.[9] In terms of TOSCA, the Parish has to be saying that its Ordinance is not "applicable to" the same "chemical substance or mixture" that Congress had in mind, and that it is not "designed to protect against a risk of injury to health or the environment associated with such substance or mixture." 15 U.S.C. Sec. 2617. Only if the Ordinance were a "sham"--which counsel for the Parish defined at oral argument as a "total subterfuge"--would it be invalid. We accept appellee's definition and hold today that Ordinance 85-1 is indeed a sham.
 
 
 35
 At the very least, an exercise of legislative rulemaking authority must be a reasonable means of attaining legitimate governmental objectives. Williamson v. Lee Optical Co., 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563 (1955); U.S. Dept. of Agriculture v. Moreno, 413 U.S. 528, 93 S.Ct. 2821, 37 L.Ed.2d 782 (1973); Jiminez v. Weinberger, 417 U.S. 628, 94 S.Ct. 2496, 41 L.Ed.2d 363 (1974). Here, of course, the question is not so much whether the challenged Ordinance is rationally related to legitimate objectives, but whether it trenches impermissibly upon a field preempted by Congress. Nevertheless, the two analyses are related. Insofar as Ordinance 85-1 amounts to an outright ban of prohibition of appellant's PCB disposal activities, it has the illegitimate objective of regulating a field preempted by Congress. Alternatively, even viewed as a "commercial solvent cleaning" regulation, the Ordinance would be an unreasonably burdensome and restrictive means of attaining that end, and would thus be in violation of the Commerce Clause.[10]
 
 
 36
 In construing Ordinance 85-1 we look to its purpose and effect. Guidance in interpreting the Ordinance is provided by (1) the chronology of events leading up to its passage--its "legislative history," so to speak; (2) the testimony below on several notable features of the Ordinance; and (3) the explicit findings of fact made by the trial judge.
 
 
 37
 Although an examination of the motives and intentions of those who enacted a measure is no substitute for a reading of its plain language, such an inquiry can provide useful context for understanding the real meaning and import of legislation.[11] In this case, as has been noted above, the challenged measure was immediately preceded by Ordinance 84-29, enacted on December 29, 1984, which provided for an express ban or prohibition of PCB disposal activities: "The treatment, storage and disposal of polychlorinated biphenyls (PCB and PCB's) at commercial waste disposal facilities within the Parish of St. James is hereby prohibited." Appellee concedes in its brief that "The original ordinance contained a ban on PCB disposal practices.... This ordinance had problems under the commerce clause and [under] several district court decisions interpreting the Toxic Substances Control Act...." Appellee's Brief at 4. The Agenda for the next meeting of the Parish Council included two references to "Amending Ordinance 84-29," and at that meeting the challenged Ordinance 85-1 was enacted to replace Ordinance 84-29. See Testimony of Paul Keller, President of St. James Parish, Tr. at 19 (Ordinance 85-1 "was intended to replace" 84-29); Testimony of Robert Benn, Jr., St. James Parish Councilman, Tr. at 71 (same). In light of the foregoing, it hardly takes a leap of faith to conclude that Ordinance 85-1 has the same purpose as the rescinded Ordinance 84-29, namely to ban or prohibit PCB disposal activity in the Parish.[12]
 
 
 38
 The district court below heard uncontroverted testimony to the effect that Ordinance 85-1 amounted either to an outright prohibition of Rollins' PCB disposal activities or an unreasonably burdensome and restrictive regulation of its "commercial solvent cleaning" business. Several key features of the Ordinance call attention to themselves. First, it provides that no commercial solvent cleaning business may be conducted within one mile of any "area of special concern," which the Ordinance defines as "a school, day care center, nursing home, grain elevator, public building or auditorium, hospital, church, or theater." The Parish President testified that this provision alone would exclude 83% of the Parish from consideration as a "commercial solvent cleaning business" site. Tr. at 26. Second, the Ordinance provides that no commercial solvent cleaning business may be located in "an area of special environmental concern," which the Ordinance defines as "a flood hazard area or flood plain, wetland, surface or subsurface drinking water source in St. James Parish." The Parish President testified that, under various possible interpretations of these terms, the entire Parish would be excluded from consideration as a "commercial solvent cleaning business" site. See Tr. at 32-37.
 
 
 39
 Finally, Ordinance 85-1 imposes a number of special building requirements for commercial solvent cleaning businesses, including the requirements that such businesses be built on a concrete slab "at least two feet thick" and that they have on site "at least one 8"' water line capable of maintaining normal pressure through at least six hours of continuous use." The Parish President testified that he had "no [idea] whatsoever" why a two-foot thick slab of concrete would be necessary for commercial solvent cleaning operations, and added that he knew of no other Ordinance imposing this requirement in the Parish. Tr. at 42. Rollins then put on an expert engineer who testified that the requirement of a two-foot thick concrete slab was "unreasonable" from an engineering point of view and that Rollins' six-inch thick slab was "totally adequate" for its intended purpose. Testimony of Ronald K. Ferris, Tr. at 55. This engineer also testified that the water supply required by the Ordinance would cover the Rollins facility to a height of fifty-eight feet. Id. at 57.
 
 
 40
 In the face of this testimony, we have no difficulty upholding the district court's finding of fact that Ordinance 85-1 was so unreasonably burdensome and restrictive that it amounted to an impermissible ban or prohibition of Rollins' PCB disposal business. The court below was explicit as to its findings:
 
 
 41
 [A]s a practical matter, in order that some reviewing Court may know how it all strikes me, I do believe that it is a very well intended, but nevertheless calculated effort to say no without actually really ever saying no.
 
 
 42
 In other words, I don't want any of the parties or the attorneys or the record or any reviewing Court to have to labor with one determination that I think I should make [as] a fact-finder and that determination is that whatever good faith I may ascribe to the witnesses who testified, and I do ascribe total good faith to them, I am still pretty much convinced that the end result sought by this Ordinance is to do exactly what you say it isn't to do, and that is to stop this company's clock, as far as operating in St. James Parish is concerned.
 
 
 43
 Tr. at 137-38; see also id. at 139, 154-55. Elsewhere in its findings of fact the district court expressly rejected the Parish's contention that its Ordinance is not a PCB regulation at all, but rather an ordinance of general applicability regulating "commercial solvent cleaning" businesses:
 
 
 44
 I perceive the Ordinance to be more far reaching than its title indicates, far more reaching than its title indicates, and ... I am convinced as a practical person and as a fact finder that the essential implications of the Ordinance are not necessarily to control a particular cleaning substance, but to stop the operations of Rollins in this parish, at least at this point in time and at this physical location.
 
 
 45
 Id. at 149-50; see also id. at 145. The district court's findings are amply supported by the record in this case. We conclude therefore that Ordinance 85-1 is an impermissible intrusion into territory preempted under TOSCA and that enforcement of it would violate the Supremacy Clause of the federal Constitution.
 
 V. CONCLUSION
 
 46
 This court is not insensitive to the concerns expressed by the Parish of St. James in this case. No one wants a toxic waste disposal facility "in his own back yard"--and for good reason. The uncontrolled chemical emissions that have occurred elsewhere this year lend sober perspective to the sanguine assurances of scientists that such mishaps will not--indeed, cannot--occur. These concerns are rightfully intensified when, as here, a hazardous facility appears to have been located almost deliberately on the most inauspicious possible site, one-quarter mile from a local elementary school.
 
 
 47
 Precisely because of such concerns, Congress enacted in the Toxic Substances Control Act a broad national program of measures to prevent and guard against the uncontrolled and hazardous emission of substances such as PCBs. If every locality were able to dodge responsibility for and participation in this program through artfully designed ordinances, the national goal of safe, environmentally sound toxic waste disposal would surely be frustrated. And, for all we know, the electrical transformers of the Romeville Elementary School may present at this very moment far greater dangers of uncontrolled and disastrous PCB emissions than the Rollins facility.
 
 
 48
 Moreover, our holding today does not mean that the Parish must simply resign itself to the present location of Rollins' ill-fated facility. As noted above, Congress also provided in TOSCA an orderly procedure by which exemptions from its preemption provisions can be sought and obtained. But the enactment of an ordinance that can only be characterized as a subterfuge is not an appropriate response to legitimate concerns over the dangers of PCBs.
 
 
 49
 The Continental Congress knew that, without a powerful preemption doctrine, its chances of forming a more perfect union of the struggling states, with their variegated philosophies and economies, would have been nil. For this reason a strong Supremacy Clause was inserted in the Constitution, and it has been justified by the events of the founding years and throughout the history of our country.
 
 
 50
 In the 1960's, for example, the Civil Rights legislation and the Voting Rights Act were distinctly distasteful to some of the states of the Union. These states responded with an agenda of frustrating and nullifying and eviscerating the benign principles of Brown v. Board of Education and the subsequent Civil Rights legislation. Thus, the state legislatures busily engaged in the legislative process, passing bills and convening the legislature in the midnight hours--at times to negate what Congress and the President had put into law the day before. It quickly became obvious that the federal supremacy fostered by the Constitution, and the doctrine of preemption as it applies when federal statutes are involved, were indispensable in assuring that there could be no interdiction of the progress of civil rights through state legislative action.
 
 
 51
 Preemption is an absolute necessity, an imperative, if the federal government is to be a federal government. To do what is asked for by the appellee in this case is really to change the whole constitutional structure of our country and to bury federalism many feet below the surface of a babbling group of states and an utterly ineffective federal government. The Constitution of the United States prevents the erection of 50 Towers of Babel.
 
 
 52
 Accordingly, we REVERSE and grant Rollins Environmental Services' petition to enjoin enforcement of Ordinance 85-1.
 
 
 53
 REVERSED.
 
 
 
 [1]
 See also Defendant's Exhibit 3 (letter from EPA administrator to Rollins stating in part that "A PCB disposal permit is not required for an activity which is specifically authorized by the PCB disposal regulation. Therefore, you may drain and flush PCB transformers in accordance with the procedures described in 40 CFR 761.60(b)(1) without an EPA permit.")
 
 
 [2]
 The Ordinance defines an area of special concern as "a school, day care center, nursing home, grain elevator, public building or auditorium, hospital, church, or theater"; an area of special environmental concern as "a flood hazard area or flood plain, wetland, surface or subsurface drinking water source in St. James Parish"; and a contained area as "a concrete slab at least two feet thick and sloped to collect any spilled solvent." The Ordinance also imposes a number of special building requirements on commercial solvent cleaning businesses and empowers the Parish Council to determine whether "a need for the proposed facility exists and the proposal is the best alternative to fill that need." "[O]n site cleaning or decontamination by any owner or his contractor" and "machinery or motor vehicle repair businesses" are specifically exempted from the scope of the Ordinance
 
 
 [3]
 Since we find federal question jurisdiction under 28 U.S.C. Sec. 1331 it is unnecessary for us to consider whether, as appears to be the case, federal jurisdiction would also lie in the district court under 28 U.S.C. Sec. 1332 (diversity jurisdiction) and 28 U.S.C. Sec. 1337 (jurisdiction under commerce regulation)
 Our finding of jurisdiction is buttressed by the fact that appellee St. James Parish did not seriously contest the issue in its brief and virtually conceded jurisdiction at oral argument.
 
 
 [4]
 In reaching the merits of this case we note that counsel for both parties briefed these issues fully. In their briefs, and at oral argument, both parties appear to have acknowledged the propriety of appellate review on the merits. See Appellee's Brief at 2 ("In order to determine that ordinance 85-1 was bona fide the Court had to hear the evidence about what the ordinance did and what Rollins proposed to do. All evidentiary issues were fully explored in the Court below."); id. at 3 ("Statement of the Issues Presented for Review"); id. at 19 ("The ... jurisdictional issue is closely intertwined with the merits. For this reason, as Rollins concedes in brief, the case was fully tried in the court below. All evidence to support the Rollins claim is now before this Court."); Appellant's Brief at 21 ("Remand of the case for findings as to the applicability of the ordinance and its validity is unnecessary, and would be wasteful of judicial resources since no issues of material fact remain and the legal issues can be fully briefed and argued in this appeal."); Appellant's Reply Brief at 3 ("The question of whether Ordinance 85-1 is constitutional, as well as the question of whether subject matter jurisdiction resides in the district court, should both be decided in this appeal."); see also Independent Bankers Association v. Heimann, 613 F.2d 1164, 1167 (D.C.Cir.1979), cert. denied, 449 U.S. 823, 101 S.Ct. 84, 66 L.Ed.2d 26 (1980)
 
 
 [5]
 The House report on TOSCA explains that
 The Committee has extended the reach of the regulatory authority of the bill to all chemical substances and mixtures whether in interstate commerce or not since the size and scope of the chemical industry makes it impossible to distinguish between those in interstate commerce and those which are not. Further, commerce in those which are arguably only in intrastate commerce may affect commerce in those which are in interstate commerce, and consequently there cannot be effective regulation of the latter without regulation of the former. Also regulation of only those in interstate commerce without regulation of the others could depress commerce and discriminate against those in interstate commerce and adversely burden, obstruct, and affect such commerce.
 H.R.Rep. No. 94-1341, 94th Cong., 2d Sess. (1976), reprinted in House Committee on Interstate and Foreign Commerce Legislative History of the Toxic Substances Control Act at 417, U.S.Code Cong. & Admin.News 1976, p. 4491.
 
 
 [6]
 Congressman McCollister, the floor manager of the bill, explained the preemption provision as follows:
 State law is preempted only when the EPA has issued a rule under section 4, section 5 or section 6 [of TOSCA]. If the EPA has not acted, the States are free to act. If the EPA has acted, then the States must apply for an exemption from the preemption.
 Before the State can put a different requirement into effect, it has to ask for an exemption from the preemption.
 This provision was designed to discourage State requirements which would put an undue burden on those companies that do business in a number of States.
 House Debate, August 23, 1976, reprinted in House Committee on Interstate and Foreign Commerce Legislative History of the Toxic Substances Control Act at 625.
 
 
 [7]
 As noted above, the EPA regulations governing PCBs were promulgated under the authority of subsection (e)(1) of section 2605 of Title 15 (TOSCA section 6(e)(1)), not subsection (a)(6) of section 2605. See 43 Fed.Reg. 7150 (Feb. 17, 1978). Thus the parenthetical exception to the preemption provision--"(other than a rule imposing a requirement described in subsection (a)(6) of section 2605 of this title)"--does not apply. See SED, Inc. v. City of Dayton, 519 F.Supp. 979, 987-88 (S.D.Ohio 1981)
 
 
 [8]
 See Warren County v. North Carolina, 528 F.Supp. 276 (E.D.N.C.1981):
 If [the Supremacy Clause] of the Constitution means anything it must mean that a county may not pass an ordinance, the effect of which is to totally frustrate an entire statutory plan enacted by the Congress for the protection of citizens in all fifty states. Were the Court to approve this ordinance, no doubt the other ninety-nine counties in North Carolina would quickly enact identical bans. What, then, would North Carolina do with the PCB laced soil? Surely our neighbors in Virginia and Tennessee, South Carolina and Georgia would also object to our carrying such wastes into their states. The Warren County ordinance clearly stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress under the Toxic Substances Control Act and, therefore, is void.
 Id. at 290. See also Twitty v. North Carolina, 527 F.Supp. 778 (E.D.N.C.1981) (companion case to Warren County ), aff'd, 696 F.2d 992 (4th Cir.1982); Chemical Waste Management, Inc. v. Broadwater, Civil Action No. 84-G-1208-W (N.D.Ala.1984), appeal dismissed, 758 F.2d 1538 (11th Cir.1985); SED, Inc. v. City of Dayton, 519 F.Supp. 979 (S.D.Ohio 1981). But see Chappell v. SCA Services, Inc., 540 F.Supp. 1087 (C.D.Ill.1982).
 
 
 [9]
 See, e.g., Appellee's Answer p 7 ("At the present time, the St. James Parish Council does not have in effect any regulations on PCB compounds.")
 
 
 [10]
 See, e.g., Pike v. Bruce Church, Inc., 397 U.S. 137, 142, 90 S.Ct. 847, 25 L.Ed.2d 174 (1970); Kassel v. Consolidated Freightways Corp., 450 U.S. 662, 670-71, 101 S.Ct. 1309, 1316, 67 L.Ed.2d 580 (1981); City of Philadelphia v. New Jersey, 437 U.S. 617, 622, 626-29, 98 S.Ct. 2531, 2534, 2536-38, 57 L.Ed.2d 475 (1978) (garbage); Hardage v. Atkins, 619 F.2d 871 (10th Cir.1980) (industrial wastes); Washington State Building and Construction Trades Council v. Spellman, 684 F.2d 627 (9th Cir.1982), cert. denied sub nom. Don't Waste Washington Legal Defense Foundation v. Washington, 461 U.S. 913, 103 S.Ct. 1891, 77 L.Ed.2d 282 (1983) (low-level radioactive waste); Illinois v. General Electric Co., 683 F.2d 206 (7th Cir.1982), cert. denied sub nom. Hartigan v. General Electric Co., 461 U.S. 913, 103 S.Ct. 1891, 77 L.Ed.2d 282 (1983) (nuclear wastes); see also Note, Pre-emption as a Preferential Ground: A New Canon of Construction, 12 Stan.L.Rev. 208, 219-20 (1959):
 The Court ... appears to use essentially the same reasoning process in a case nominally hinging on pre-emption as it has in past cases in which the question was whether the state law regulated or burdened interstate commerce. [T]he Court has adopted the same weighing of interests approach in pre-emption cases that it uses to determine whether a state law unjustifiably burdens interstate commerce. In a number of situations the Court has invalidated statutes on the pre-emption ground when it appeared that the state laws sought to favor local economic interests at the expense of the interstate market.
 
 
 [11]
 See Pacific Gas and Electric, 461 U.S. at 216, 103 S.Ct. at 1728; United States v. O'Brien, 391 U.S. 367, 383, 88 S.Ct. 1673, 1682, 20 L.Ed.2d 672 (1968)
 
 
 [12]
 Further evidence that the purpose of the Ordinance was to ban or prohibit PCB disposal activities in general, and Rollins' business in particular, is to be found in the provisions of the Ordinance that inexplicably exempt local businesses from its prohibitions:
 The term ["Commercial Solvent Cleaning Business"] shall not include on site cleaning or decontamination by any owner or his contractor nor does it include machinery or motor vehicle repair businesses when cleaning and decontamination is incidental to a bona-fide effort to repair the machinery or vehicle.