**MISSOURI PACIFIC RAILROAD COMPANY, Southern Pacific Transportation Company, the Atchison, Topeka and Santa Fe Railway Company, Burlington Northern Railroad Company, Missouri–Kansas–Texas Railroad Company, St. Louis–Southwestern Railway Company, Kansas City Southern Railway Company and Louisiana and Arkansas Railway Company**

**v.**

**RAILROAD COMMISSION OF TEXAS and its members, Hon. James E. Nu-** **gent, Hon. Mack Wallace and Hon. Clark Jobe.**

**Civ. No. A–86–CA–569.**

United States District Court,
W.D. Texas,
Austin Division.

June 17, 1987.

---

Robert B. Burns, Jr., Wilson, Grosenheider & Burns, Austin, Tex., for Topeka Santa Fe Ry. Atchison, Kansas City Southern Ry. Co., Louisiana and Arkansas Ry. Co., and Missouri Pacific Ry. Co., plaintiffs.

Frank W. Calhoun, Lidell, Sapp & Zivley, Houston, Tex., for Burlington Northern R. Co. plaintiff.

Michael E. Roper, MKT R. Co., Legal Dept., Dallas, Tex., for Missouri–Kansas–Texas R. Co. plaintiff.

Hugh L. McCulley, Houston, Tex., for Southern Pacific Transp., St. Louis–Southwestern Ry. Co., plaintiffs.

Douglas B. Fraser, Energy Div./Transp., Austin, Tex., for Clark Jobe, James E. Nugent, R.R. Comm. of Texas and Mack Wallace, defendants.

## AMENDED MEMORANDUM OPINION AND ORDER

NOWLIN, District Judge.

Pursuant to Rule 60(a), the Court hereby amends its Memorandum Opinion and Order of May 8, 1987, and substitutes this corrected version.

Before the Court is the Plaintiff's Complaint for Declaratory and Injunctive Relief. The Court, having considered all of the briefs and evidence filed in this case, enters the following Memorandum Opinion.

## I. BACKGROUND

On June 16, 1986 the Railroad Commission of Texas (RRC) adopted a rule requiring a caboose on most trains operating in Texas. The rule is codified at 16 TEX.ADMIN.CODE § 5.622. The rule had an effective date of July 7, 1986, and a compliance date of January 7, 1987. The Plaintiffs filed this action on October 17, 1986, and moved for a Temporary Restraining Order on January 5, 1987. On January 6, 1987 the Court, finding that the Plaintiff railroads (Railroads) were likely to succeed

on the merits of their preemption claims, granted the TRO. The Railroads then filed a Motion for Preliminary Injunction, which came on for hearing before this Court on January 20, 1987. At the hearing, the parties submitted extensive testimony in affidavit form, and presented detailed legal arguments. At the close of the hearing, the Court made an oral ruling that the Railroads were entitled to the injunction.

Before the hearing began, the RRC made an oral motion to consolidate the hearing on the preliminary injunction with the trial on the merits, pursuant to FED.R.CIV.P. 65(a)(2). The Court directed the RRC to reduce that motion to writing and file it with the Clerk. The RRC has done so, and although the Railroads initially opposed the motion, they have since stated that they have no objection to such a consolidation. Thus, this matter is now before the Court for a final judgment. As noted, the hearing on the Railroads' Motion for Preliminary Injunction addressed only the preemption arguments. The Railroads have also stated claims for relief based upon arguments that the rule violates the commerce and contract clauses of the Constitution, that adoption of the rule was an *ultra vires* act by the RRC, and that the rule was an arbitrary and capricious act by the RRC. In keeping with the "settled practice" of not reaching constitutional issues unless necessary to resolve the case, *see F.C.C. v. Pacifica Foundation,* 438 U.S. 726, 735, 98 S.Ct. 3026, 3033, 57 L.Ed.2d 1073 (1978), the Court will not address the constitutional challenges to the rule. The Court also declines to rule on whether the RRC acted arbitrarily or capriciously in enacting the rule, or whether the act was *ultra vires.* Rather, the Court will address only the preemption arguments made by the Railroads, as those arguments are dispositive of the case.

## II. JURISDICTION

As noted, this is an action for a declaratory judgment that the rule at issue is preempted by federal law, and for a permanent injunction enjoining enforcement of the rule. The RRC has made several arguments disputing the Court's jurisdiction over this matter. Those arguments are: (1) the Railroads lack standing to assert the interests of the federal government; (2) no case or controversy exists; (3) the case is not ripe; and (4) no federal question jurisdiction exists. The Court has examined these identical arguments, made in identical form, in another case. *Missouri Pacific Railroad Company, et al v. Railroad Commission of Texas, et al,* 653 F.Supp. 617 (W.D.Tex.1987) (*MoPac I*). In the Court's order granting summary judgment in that case, the Court found that all the arguments were without merit. Rather than restate what has already been said elsewhere, the Court will incorporate into this opinion that part of the order granting summary judgment in *MoPac I* which relates to jurisdiction. The arguments made in this case, identical to those made in *MoPac I,* have no more merit here than they did there, and will be rejected for the reasons stated in *MoPac I.* The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 2201 and 28 U.S.C. § 1331.

## III. PREEMPTION

The Railroads have articulated several bases for a finding that section 5.622 is preempted by federal law. They argue that the rule is preempted by the Locomotive Boiler Inspection Act (LBIA), 45 U.S.C. § 22 *et seq.* (1986); the Federal Railroad Safety Act (FRSA), 45 U.S.C. § 421 *et seq.* (1986); and the Hazardous Materials Transportation Act (HMTA), 49 U.S.C. § 1801 *et seq.* (1976).

The Supremacy Clause, U.S. CONST. art. VI, cl. 2, nullifies state laws that "interfere with or are contrary to" federal law. *Hillsborough County v. Automated Medical Laboratories, Inc.,* 471 U.S. 707, 105 S.Ct. 2371, 2375, 85 L.Ed.2d 714 (1985) (*quoting Gibbins v. Ogden,* 9 Wheat 1, 211, 6 L.Ed. 23 (1824) (Marshall, C.J.)); *Rollins Environmental Services, Inc. v. Parish of St. James,* 775 F.2d 627, 634 (5th Cir.1985). Congress is authorized to absolutely preempt state and local rulemaking authority in a particular field. *Pacific Gas & Electric Co. v. State Energy*

*Resources Comm'n,* 461 U.S. 190, 203–04, 103 S.Ct. 1713, 1721–22, 75 L.Ed.2d 752 (1983); *Jones v. Rath Packing Co.,* 430 U.S. 519, 525, 97 S.Ct. 1305, 1309, 51 L.Ed.2d 604 (1977).

> Even where Congress has not entirely displaced state and local rulemaking in a specific area, those lower laws are preempted to the extent that they conflict with federal law. Where a lower law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress,' *Hines v. Davidowitz,* 312 U.S. 52, 67 [61 S.Ct. 399, 404, 85 L.Ed. 581] (1941), it is preempted.

*Rollins,* 775 F.2d 634. Congressional intent to preempt state law in a given area may be inferred from the existence of a comprehensive scheme of federal regulation. *Hillsborough,* 105 S.Ct. at 2375. Preemption is also inferred when the area of law is one in which "the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947). Finally, state laws can be preempted by federal regulation as well as by federal statute. *Hillsborough,* 105 S.Ct. at 2375 (*citing Capital Cities Cable, Inc. v. Crisp,* 467 U.S. 691, 699, 104 S.Ct. 2694, 2700, 81 L.Ed.2d 580 (1984)).

### A. *The LBIA*

Although the LBIA does not contain an express preemption provision, the Supreme Court has held that the LBIA wholly preempts the subject matter of locomotive equipment. *Napier v. Atlantic Coast Line Railroad Co.,* 272 U.S. 605, 613, 47 S.Ct. 207, 210, 71 L.Ed. 432 (1926). This rule was recently affirmed in *Consolidated Rail Corp. v. Pennsylvania Public Utility Commission,* 536 F.Supp. 653, 656–57 (E.D.Pa.1982), *aff'd mem.,* 696 F.2d 981 (3d Cir.1982), *aff'd mem.,* 461 U.S. 912, 103 S.Ct. 1888, 77 L.Ed.2d 280 (1983). The rule, as stated in *Napier* is that

> state legislation is precluded, because the Boiler Inspection Act, as we construe it, was intended to occupy the field. The

broad scope of authority conferred upon the Commission leads to that conclusion. Because the standard set by the Commission must prevail, requirements by the states are precluded, however commendable or however different their purpose.

*Napier,* 272 U.S. at 613, 47 S.Ct. at 210.

### B. *The FRSA*

■ The FRSA contains an express preemption provision:

> The Congress declares that laws, regulations, orders, and standards relating to railroad safety shall be nationally uniform to the extent practicable. A State may adopt or continue in force any law, rule, regulation, order, or standard relating to railroad safety until such time as the Secretary has adopted a rule, regulation, order, or standard covering the subject matter of such State requirement. A State may adopt or continue in force an additional or more stringent law, rule, regulation, order, or standard relating to railroad safety when necessary to eliminate or reduce an essentially local safety hazard, and when not incompatible with any Federal law, rule, regulation, order, or standard, and when not creating an undue burden on interstate commerce.

45 U.S.C. § 434 (1986). Thus, when the Secretary of Transportation promulgates rules or regulations that cover rail safety, a state may adopt or continue in force similar laws, rules or regulations only

1) when necessary to eliminate or reduce an essentially local safety hazard, and

2) when not incompatible with any federal provision, and

3) when not creating an undue burden on interstate commerce.

*E.g., Donelon v. New Orleans Terminal Co.,* 474 F.2d 1108, 1112 (5th Cir.), *cert. denied,* 414 U.S. 855, 94 S.Ct. 157, 38 L.Ed.2d 105 (1973). If a state's rules or regulations covering a federally-addressed rail safety issue are to survive preemption, the state must establish each of the elements of this narrow exception. *Id.; National Ass'n of Regulatory Utilities Commissioners v. Coleman,* 542 F.2d 11, 13 (3rd Cir.1976).

Obviously, a key inquiry in this case is to what extent the FRSA, or any other act concerning rail safety,[1] has covered the subject matter of section 5.622. This determination turns on the definition of "covering the subject matter," a key phrase contained in section 434. Although the phrase is not defined in the statute, an analysis of the Congressional intent in enacting section 434 sheds light on the meaning of the phrase.

> [The rail industry] has a truly interstate character calling for a uniform body of regulation and enforcement. It is a national system.... The integral operating parts of these companies cross many State lines. In addition to the obvious areas of rolling stock and employees, such elements as operating rules, signal systems, power supply systems, and communication systems of a single company normally cross numerous State lines. To subject a carrier to enforcement before a number of different State administrative and judicial systems in several areas of operation could well result in an undue burden on interstate commerce.

H.R.REP. NO. 1194, 91st Cong., 2d Sess., *reprinted in* 1970 U.S.CODE CONG. & AD.NEWS 4104, 4410–11. Thus, it is clear that Congress intended to establish uniform national rail safety standards. Courts that have considered the phrase in the entire context of section 434, have read it as a narrow exception to a broad preemption of state regulation in rail safety matters. *National Ass'n of Regulatory Utilities Commissioners v. Coleman*, 542 F.2d 11, 13 (3d Cir.1976); *Donelon v. New Orleans Terminal Co.*, 474 F.2d 1108 (5th Cir.1973); *Consolidated Rail Corp. v. Pennsylvania Public Utility Comm'n*, 536 F.Supp. 653, 657 (E.D.Penn.1982); *Atchison, Topeka & Santa Fe Railway Co. v. Illinois Commerce Commission*, 453 F.Supp. 920, 926 (N.D.Ill.1977). In short, the statute evinces a total preemptive intent in rail safety matters, with very limited exceptions.

As noted, if federal regulations address a rail safety matter, states may regulate in that area only when all three prongs of the preemption test established in 45 U.S.C. § 434 are satisfied. The language of the statute clearly demonstrates that all three groups must be established or the state regulation will be preempted. 45 U.S.C. § 434; *see Donelon*, 474 F.2d at 1112. Congressional intent regarding the first prong, local hazards, is clear from the House Reports on the 1970 Railroad Safety Act:

> The purpose of this latter provision is to enable the States to respond to local situations not capable of being adequately encompassed within uniform national standards. The States will retain authority to regulate individual local problems or reduce essentially local railroad safety hazards. Since these local hazards *would not be Statewide in character*, there is no intent to permit a State to establish Statewide standards superimposed on national standards covering the same subject matter.

H.R.REP. NO. 1194, 91st Cong., 2d Sess., *reprinted in* 1970 U.S.CODE CONG. & AD.NEWS 4104, 4117.

Courts that have addressed the issue have consistently held that the first prong of the test does not authorize imposition of statewide standards. *E.g., Coleman*, 542 F.2d at 14–15 (state accident reporting requirements, largely duplicative of similar federal requirements, preempted due to statewide impact); *Consolidated Rail Corp.*, 536 F.Supp. at 658 (regulation that required speed recorders preempted because it had statewide impact); *Atchison, Topeka & Santa Fe*, 453 F.Supp. at 926 (state commodities regulations preempted due to statewide impact).

### C. *The HMTA*

The HMTA also contains a preemption provision. That section provides that

> any requirement, of a State or political subdivision thereof, which is inconsistent

---

**1.** Section 434 refers to acts by "the Secretary," referring to the Secretary of Transportation, and does not confine itself to acts pursuant to the FRSA. Thus, an act by the Secretary pursuant to, for example, the HMTA could preempt state law under the terms of section 434.

with any requirement set forth in [the, HMTA], or in a regulation issued under the [the HMTA], is preempted.

49 U.S.C. § 1811(a) (1976). Regulations adopted pursuant to the statute also allow a state to apply for an "inconsistency determination" by the Secretary of Transportation to determine if a state rule is preempted under section 1811(a). 49 C.F.R. § 107.-203 (1986). The Secretary may waive the preemptive effect of the statute and regulations should she find the state rule inconsistent, so long as the requirements of section 1811(b) are met. *Id.* at 1811(b). The RRC has not sought such a determination from the Secretary.[2] Much like the FRSA, the HMTA was enacted to provide a means of uniform regulation of the transportation of hazardous materials. *Consolidated Rail Corp. v. City of Dover*, 450 F.Supp. 966 (D.Del.1978). *See also* H.REP. NO. 1083, 93rd Cong., 2d Sess. 4, *reprinted in* 1974 U.S.CODE CONG. & AD.NEWS 7669 (stating purpose of Act was to "broaden federal regulatory control over interstate or foreign shipments of hazardous materials by rail and other transportation modes"). In determining whether a state rule is inconsistent with the HMTA or its regulations, a court must make a two-fold inquiry:

(1) Whether compliance with both the state rule and the HMTA (or its regulations) is possible;

(2) The extent to which the state rule is an obstacle to the accomplishment and execution of the HMTA and its regulations.

*National Tank Truck Carriers, Inc. v. Burke*, 535 F.Supp. 509, 515 (D.R.I.1982), *aff'd*, 698 F.2d 559 (1st Cir.1983). As noted in *Tank Truck Carriers*, these criteria are the traditional judicial tests of preemption. *Id.*

It is under this vast body of federal law that the Court must now examine section 5.622 and determine if any of these statutes preempt the section.

**D.** *Section 5.622*

16 TEX.ADMIN.CODE § 5.622 provides as follows:

(a) Except as provided in subsections (c) and (d) of this section, each railroad corporation operating in the state of Texas shall place a caboose occupied by at least one employee on the train crew as the last car on any freight train that is required by the Federal Railroad Administration rules (49 Code of Federal Regulations Part 232) to have its air system and cars inspected by qualified inspecting employees or certified federal inspectors. The exception prescribed in subsection (d) of this section shall not apply to any train in which the consist includes any car containing a load or residue of a hazardous material included in the following Standard Transportation Commodity Code (Western Trunk Line Committee, Agent, Tariff STCC 6001 series) groups: 4901 (Class A explosives); 4902 (Class B explosives) 4904; (non-flammable compressed gases); 4905 (flammable compressed gases); 4906, 4907, 4908 (flammable liquids); 4920 (poisons Class A); 4921 (poisons Class B); and 4930 (corrosive materials).

(b) Each caboose must be equipped with an operable radio system which will enable two-way communication between the caboose and the head of the train.

(c) A caboose is not required on freight trains satisfying either of the following conditions:

(1) a length of 2,000 feet or less; or

(2) operating within a railroad yard or within yard limits as designated pursuant to 49 Code of Federal Regulations § 218.35.

(d) A caboose is not required on freight trains satisfying all of the following conditions:

(1) flag protection against following trains on the same track is not required by 49 Code of Federal Regulations § 218.37;

---

**2.** A party need not seek an inconsistency determination before litigating the issue. *National Tank Truck Carriers v. Burke*, 608 F.2d 819, 822 (1st Cir.1979); *New Hampshire Motor Transport Association v. Flynn*, 751 F.2d 43, 50–51 (1st Cir.1984).

(2) the track route is equipped with wayside overheated journal and dragging equipment detectors located along such route, at intervals not exceeding 30 miles in distance, which are able to communicate directly to the train's operating crew information related to the safety of that train's operation, including: acknowledgement of the train's presence at the detector, the nature of defect found, and the location within the train of any defect detected;

(3) the track route is equipped with high-shifted load detectors in advance of locations where it can reasonably be foreseen that a high or shifted load could cause an unsafe condition when moving through such locations;

(4) there is an operating telemetry device located on the trailing end of the rear-most car capable of communicating the following information to the locomotive engineer: motion, brakepipe pressure, and power condition of the transmitting device;

(5) there is a counting device which enables the locomotive engineer to ascertain the length of the train; and

(6) there are no cars containing open top loads which exceed the railway's line clearances, as published annually (National Railway Publication Company, *Railway Line Clearances*), placed farther than 2,000 feet behind the controlling locomotive.

(e) Any railroad corporation may apply for a variance from the requirements of this section on a form to be prescribed by the commission. Such application shall be governed by the rules contained in Chapter 5, Subchapter U of this title (relating to General and Special Rules of Practice and Procedure), as they may be from time to time amended. The Commission may approve such application for good cause shown.

(f) Each railroad corporation shall comply with the provisions of this section no later than six months after the effective date of this section.

The rule thus requires that *any* train longer than 2000 feet which has a consist in-cluding a listed hazardous material or its residue *must* have a caboose outside rail yards, regardless of whether the six requirements of section (d) are met. Further, any train longer than 2000 feet operating outside of a rail yard, regardless of its contents, must either operate on a track meeting the requirements of section (d), or have a manned caboose as the last car. The requirements of section (d) thus become very important. Those requirements are that (1) no flag protection is required by federal regulation; (2) the track is equipped with overheated journal and dragging equipment detectors, at specified intervals, able to communicate directly with the locomotive; (3) the track is equipped with high/shifted load detectors in specified locations; (4) the train is equipped with an operating telemetry device at the rear of the train capable of communicating specified information to the locomotive engineer; (5) the train is equipped with a counting device enabling the locomotive engineer to determine the length of the train; and (6) there are no cars with open top loads exceeding the railway's line clearances. Further, section (b) provides that all cabooses must be equipped with a radio capable of two-way communication with the locomotive.

### 1. *Locomotive equipment*

As noted earlier, the LBIA has been held to completely preempt the field of locomotive equipment. *Napier,* 272 U.S. at 613, 47 S.Ct. at 210. This rule was affirmed in *Consolidated Rail,* where the court ruled that a Pennsylvania regulation requiring speed recorders and indicators to be placed on locomotives was preempted by the LBIA. 536 F.Supp. 653. That decision was affirmed without opinion by both the Third Circuit, 696 F.2d 981, and the Supreme Court, 461 U.S. 912, 103 S.Ct. 1888, 77 L.Ed.2d 280. The prohibition against state legislation in this area "extends to the design, the construction and the material of every part of the locomotive and tender and of all the appurtenances." *Napier,* 272 U.S. at 611, 47 S.Ct. at 209.

The Railroads contend that because section (b) requires a radio in the caboose

capable of two-way communication with the locomotive, it also in essence requires such a radio in the locomotive. This, they argue, is prohibited by the LBIA, as a radio is locomotive equipment. The RRC responds by stating that the rule requires nothing in the locomotive, and that even if it does, a radio is not an appurtenance, and is outside the scope of the LBIA's preemptive sphere. The RRC's first argument defies logic. If the caboose must have a radio capable of two-way communication with the locomotive, then the locomotive must be equipped with at least a compatible radio. The rule does in effect, therefore, require any locomotive pulling a train with a caboose to have a two-way radio capable of communicating with the caboose.

■ The only remaining question then, is whether this rule is one governing locomotive "equipment or appurtenances." The RRC argues that an appurtenance is something which is in fact an integral or essential part of a completed locomotive, *citing Southern Railway Co. v. Lunsford,* 297 U.S. 398, 402, 56 S.Ct. 504, 506, 80 L.Ed. 740 (1936). This, they argue, does not include a radio. *Lunsford* does not support the RRC's argument, however. The Supreme Court's statement in *Lunsford* was that "whatever in fact is an integral or essential part of a completed locomotive, *and all parts or attachments* definitely prescribed by lawful order of the Interstate Commerce Commission, are within the statute." *Id.* at 402, 56 S.Ct. at 506. The Court went on to say that "mere experimental devices which do not increase the peril, but may prove helpful in an emergency, are not" prohibited by the LBIA. *Id.* A radio is not a "mere experimental device," and is certainly a part or attachment to the locomotive. *Lunsford* is thus inapplicable to this case. The Court is of the view that a radio is certainly a part or appurtenance of a locomotive governed by the LBIA, and section (b) is therefore preempted by the LBIA.

This result is confirmed by the Supreme Court's affirmance of the *Consolidated Rail* decision. In *Consolidated Rail* the equipment at issue was a speed recorder and indicator. Such equipment is neither integral nor essential to the operation of a locomotive. Nevertheless, the court found that the Pennsylvania requirement was preempted by the LBIA, and that decision was affirmed by both the Third Circuit and the Supreme Court. *Consolidated Rail,* 536 F.Supp. 653, *aff'd,* 696 F.2d 981, *aff'd,* 461 U.S. 912, 103 S.Ct. 1888, 77 L.Ed.2d 280.

■ Section (d)(4) is also challenged by the Railroads. That section requires an operating telemetry device on the rear of the train capable of communicating designated information to the locomotive engineer. Although the RRC argues that, like the radio rule, this provision does not require anything on the locomotive, it is clear that the rule would require a unit on the locomotive able to receive signals from the rear-end device. Moreover, the RRC itself has recognized that the requirement necessitates installation of equipment in the locomotive. *See* Defendant's Response to Request for Admission No. 13 (admitting that the rule requires "telemetry receiving equipment installed on the locomotive"). *See also Transportation Division Memorandum and Recommendation* on section 5.622 at 33, 41. There can be no question that such a requirement is preempted by the LBIA. Likewise, subpart (5) of section (d) is preempted, as it requires a counting device which enables the engineer to determine the length of the train. This device also requires installation of a locomotive receiving appliance. *Id.* at 42. ("This odometer device is considered as an appurtenance to the head end unit of the telemetry device.") The subpart is therefore preempted by the LBIA.

The Railroads also argue that section (d)(2) is preempted by the LBIA. That subpart requires the installation of dragging equipment and overheated journal wayside detectors, located at specified intervals, and capable of "communicat[ing] directly to the train's operating crew" certain information. The Railroads argue that this means that a receiving device must be placed in the locomotive to receive the sig-

nals from the wayside detectors. The RRC responds that the rule does not *require* such equipment, as some detectors merely use a signal on the roadbed which alerts the crew that a detector has located a problem. The crew then receives specific information from a readout on the roadbed.

The Court is of the view that the rule does require the installation of equipment in the locomotive. First, the rule states that the detectors must be capable of communicating information *"directly* to the train's operating crew." This language implies that the detectors required are distinct from detectors which communicate *indirectly, such as the roadbed readouts the RRC argues the rule allows. The RRC's own evidence supports this conclusion. The RRC offered the testimony of Robert S. Farnsworth on this point. His testimony was:

> The next portion of the rule, 5.622(d)(2), requires the placement of wayside overheated journal and dragging equipment detectors along the routes chosen by the railroads to operate cabooseless trains. The railroad industry's position is well known that technological advances, particularly in the realm of wayside detectors, has made an occupied caboose obsolete. What the railroads do not publicize is the fact that not all rail routes are equipped with such detectors. Furthermore, many of the detectors now in place cannot and do not communicate the train's status to the crew members located on the train's head end. The detector readout and alarm light at these sites are located immediately adjacent to the detector; therefore, the only means of communications [sic] between the detector and the train crew is visually from the caboose as the train completely passes the detector. The UP and the MKT both testified that this type of detector is being upgraded to one that "talks" to the train crew. Until the upgrade programs are completed, however, these detectors are useless for trains being operated without a caboose. Hence, operating expediency, not technology, is replacing the caboose for trains operating over these

routes. For this reason, the Commission requires not only the installation of wayside detectors but that the detectors be able to communicate basic train-related information to the head-end train crew if a long freight train is to operate without a caboose.

Affidavit of Robert S. Farnsworth at 9. Further support for this construction of the rule is found in the *Transportation Division Memorandum and Recommendation* on 5.622, where the distinction between "talking" detectors and other types of detectors is discussed. *Id.* at 28–31. One of the noted differences was that "talking" detectors convey signals "directly" to the train crew. *Id.* at 30. Finally, the RRC's statements in enacting the rule praise the effectiveness of detectors which "transmit an audible or radio readout signal to the locomotive engineer...." 11 Tex.Reg. at 2975 (1986). The only logical conclusion from all this is that subpart (d)(4) requires detectors that "talk" to the head-end of the train, and thus require the installation of equipment on the locomotive. This requirement is preempted by the LBIA.

In summary, the LBIA preempts section (b) and sections (d)(2), (4) and (5), as those sections require the installation of equipment on the locomotives of trains.

#### 2. *Rail safety regulations*

As discussed above, the FRSA prohibits the states from enacting laws in any area where federal regulation has completely occupied the field. If federal regulations address a rail safety matter but do not wholly occupy the field, state regulation is only permitted if the three-prong test of 45 U.S.C. § 434 is met. Finally, if there is no federal regulation covering a rail safety matter, the states are free to regulate the area.

The Federal Railroad Administration (FRA) has considered and rejected proposals similar to the instant rule. In 1986 the FRA discussed a proposed rule allowing the use of end-of-train telemetry devices as substitutes for visual inspection of braking systems. In discussing the comments received on the rule the FRA stated that:

The major objection raised by commenters opposed to the proposed rule was the opinion that elimination of a caboose from the end of a train adversely affects safety. For example, the comments of the Railway Labor Executives' association and the United Transportation Union called for new requirements, e.g., overheated bearing/wheel detectors, train length restrictions, and dragging equipment detectors, to counteract the perceived safety detriment of cabooseless trains. FRA does not agree with this line of analysis. First, nothing in any current FRA regulation requires a caboose on any train, nor does anything in the final rule issued in this docket authorize the removal of a caboose. The determination on whether a railroad uses a caboose on any given line is made through the collective bargaining process. Moreover, the FRA does not consider the lack of a caboose to be a safety issue per se. While this final rule may facilitate railroads' obtaining economic benefits from cabooseless operations, it does not in any way determine whether a caboose will or will not be used.

51 Fed.Reg. 17,300—301 (1986). The proposed rule was adopted and is now codified at 49 C.F.R. § 232.19 (1986). It is notable that one of the commentators mentioned by the FRA was the party who initiated the rule-making procedure before the RRC in this case. *See Petition Proposing Rulemaking Requiring Cabooses on Trains*, filed by the United Transportation Union of Texas. The FRA's statements make it clear that it rejected the commentator's proposal that either a caboose be required on trains, or certain equipment be required in lieu of a caboose.

■ The FRA's inaction in this area constitutes an affirmative ruling that caboose regulation is inappropriate. *Ray v. Atlantic Richfield Co.*, 435 U.S. 151, 178, 98 S.Ct. 988, 1004, 55 L.Ed.2d 179 (1978). In *Ray* the Court stated that it

has previously recognized that 'where failure of ... federal officials affirmatively to exercise their full authority takes on the character of a ruling that no such regulation is appropriate or approved pursuant to the policy of the statute,' States are not permitted to use their police power to enact such a regulation.

*Id. citing Napier*, 272 U.S. at 605, 47 S.Ct. at 207. The FRA's refusal to implement a rule requiring a caboose on trains, or in the alternative to require certain equipment on tracks, takes on the character of a ruling that no such regulation is appropriate. At a minimum, the FRA has addressed the subject matter of section 5.622, and has refused to enact caboose regulations. In order for section 5.622 to be valid, therefore, it must pass the three-prong test of 45 U.S.C. § 434. By its own admission, the RRC recognizes that section 5.622 is statewide in its application, and therefore does not address a local safety hazard. *See* Defendant's Response to Request for Admission No. 1. Thus, the rule is preempted.

■ Regardless of whether the entire rule is preempted, select provisions of section 5.622 are preempted under the FRSA. For example, the Railroads argue that section (d)(1) is preempted by the FRSA. That section is one of the six requirements a track must meet before a cabooseless train may be operated on that track. Section (d)(1) requires that no flag protection be required by federal regulation before a cabooseless train may run on the track. The Railroads point out that 49 C.F.R. § 218.37 details the safety precautions that must be taken when flag protection is appropriate. The requirement of a caboose is not included among those precautions. Thus, the Railroads argue that section 218.37 completely occupies the field, or at least addresses the subject matter of section (d)(1), and (d)(1) is therefore preempted. It is clear that the FRA has addressed the subject matter of the precautions necessary when flag protection is required. *See* 49 C.F.R. § 218.37 (1986). Indeed, it is arguable that section 218.37 wholly occupies the field in this area. The Court need not decide this latter issue, however, as it is clear that the FRA has addressed the issue, and that section (d)(1) fails the three-prong test of 45 U.S.C. § 434 for failure to address a local safety hazard. The RRC does

not deny that section (d)(1) imposes statewide standards. *See* Defendant's Response to Request for Admission No. 1. Thus, the first part of the three-prong test of section 434 has not been met, *see supra* at 471, and the subpart is preempted. 45 U.S.C. § 43 (1986).

The FRA's statements when enacting 49 C.F.R. § 218.37 support this conclusion. In discussing public comments on the proposed rule, the FRA stated that one commentator

> would prefer that regulation in this area be left to the various States. As stated above, the FRA believes that there are adequate provisions for the safety of train movements within automatic block signal territory without the addition of protective flagging. Safe train operations are dependent upon the train crew's strict compliance with all signal indications, operating rules and other instruction governing the movement of their train. The FRA believes that this rule provides an adequate degree of safety in a reasonable manner. With respect to this commenter's preference for State regulation as opposed to Federal regulation, the policy of the Federal Railroad Safety Act of 1970, as expressed in section 205 (45 U.S.C. 434), has committed FRA to promoting uniform national regulation to the extent practicable. The FRA, as well as NTSB, has noted the need for revision of rule 99. We cannot assure that all States will adopt a regulation, and even if all did, we cannot assure that all 50 would be uniform. The necessity of complying with a multitude of rules is not only burdensome to carriers, but also confusing to operating employees. The FRA believes, therefore, that a single uniform Federal regulation is preferable to a multitude of different state regulations.

> Another commenter asked that the final regulation specifically provide that more stringent State rules or laws would take precedence over a less stringent Federal regulation. The relationship between Federal regulations issued under the Federal Railroad Safety Act and State regulations governing the same

subject matter is governed by section 205 of that Act. That statutory provision prescribes the preemption of all State laws, rules, regulations, orders and standards concerning the same subject matter as a Federal regulation, except where such a State provision addresses an essentially local safety hazard and is not incompatible with the Federal provision. In light of this statutory provision, FRA does not have the authority to amend the rule as requested by this commenter.

42 Fed.Reg. 5062 (1977). As noted, section (d)(1) does not address a local safety hazard, and it is therefore preempted.

■ Section (d)(2) suffers from a similar deficiency. That section requires that cabooseless trains run on a track equipped with overheated journal and dragging equipment detectors, at specified intervals. The FRA has already addressed the subject matter of dragging equipment detectors. 49 C.F.R. § 236.601 provides:

> Signals controlled by devices used to provide protection against unusual contingencies, such as landslides, dragging equipment, burned bridges or trestles and washouts shall be located so that stopping distance will be provided between the signal and the point where it is necessary to stop the train.

49 C.F.R. § 236.601 (1986). The RRC admits that section (d)(2) is statewide in application, and thus does not address a local safety hazard. Defendant's Response to Request for Admission No. 1. Insofar as section (d)(2) addresses the area of dragging equipment detectors, it is preempted by section 236.601.

■ The Railroads also contend that section (d)(4) is preempted by the FRSA. Section (d)(4) requires the use of end-of-train telemetry devices on cabooseless trains. As noted at the outset of this section, the FRA recently adopted a rule allowing the use of such devices as substitutes for visual inspection of brake systems. During the rule-making proceeding the FRA received comments suggesting the necessity of such devices on trains without cabooses. *See* 51 Fed.Reg. 17,300–

301 (1986) (quoted *supra* at 476). The FRA expressly rejected the commentator's proposal, and enacted a rule which does not require telemetry devices on cabooseless trains. *See* 49 C.F.R. § 232.19 (1986). The FRA's action constitutes an affirmative ruling that such regulation is inappropriate. Section (d)(4) is therefore preempted. 45 U.S.C. § 434; *Ray*, 435 U.S. at 178, 98 S.Ct. at 1004.

Finally, the Railroads argue that section (b) is preempted under the FRSA, because rail safety rules already address the area of radio communications, and section (b) does not meet the three-prong test of section 434. The Railroads cite 49 C.F.R. §§ 220.23, 220.39, and 220.47 as proof that federal regulation already addresses this area. These regulations address procedure for the use of radios in manned cabooses or locomotives. The Court has already found section (b) preempted under the LBIA. The Court therefore declines to resolve the question of whether the FRA has addressed the subject matter of section (b), as it is unnecessary to resolution of the case.

In summary, the FRSA preempts all of section 5.622. The FRA considered the caboose issue and declined to enact a rule requiring a caboose or requiring certain equipment on cabooseless trains. In the alternative, and at the very least, the FRSA preempts sections (d)(1) and (4), and that part of (d)(2) relating to dragging equipment detectors, as the FRA has addressed these areas, and the relevant sections do not address local safety hazards.

### 3. *Hazardous materials*

The HMTA contains its own preemption provision. That provision provides for the preemption of state laws that are inconsistent with any requirement of the HMTA or a regulation promulgated thereunder.[3] 49 U.S.C. § 1811(a) (1976). To determine if a state law is "inconsistent" under section 1811(a) the Court must decide:

 (1) Whether compliance with both the state rule and the HMTA is possible; and

 (2) The extent to which the state rule is an obstacle to the accomplishment and execution of the HMTA and its regulations.

*Tank Truck Carriers*, 535 F.Supp. at 515. The Railroads contend that section 5.622's requirement of a caboose on all trains over 2000 feet in length with a consist or residue of hazardous materials is inconsistent with the HMTA or HMR in several ways. The Court will focus on two of those arguments: First, whether the rule is inconsistent with the HMTA or HMR because it will cause delays and extra switching and handling of hazardous materials, and next, whether the rule is inconsistent because it creates a hazard class or classes with requirements in addition to those set by the HMTA and its regulations. The Court will discuss only these arguments. The Court declines to reach a conclusion on the Railroads' other arguments for inconsistency, as they are unnecessary to the resolution of this issue.

The Railroads' first argument turns on the resolution of factual matters. The Railroads submitted affidavits from Chris Aadnesen of the Union Pacific Railroad Company (which system includes the Missouri Pacific Railroad Company); A.M. Hensen of the Southern Pacific Transportation Company; D.E. Mader of the Atchison, Topeka and Santa Fe Railway Company; Andrew J. Thompson of the Burlington Northern Railroad Company; and L.D. Fields of the Kansas City Southern Railway Company and its subsidiary, the Louisiana and Arkansas Railway Company. In response, the RRC filed the affidavits of Robert S. Farnsworth, a State Rail Planner with the RRC; Hugh F. Keepers, Director of Safety for the RRC; and Doug M. Gott, a conductor with the Union Pacific Railroad Company. The Railroads submitted the additional affidavit of Leo R. Tierney of the Union Pacific Railroad in its Reply to the RRC's Response. The Railroads also tendered five exhibits after the hearing. The Court received no objection from the RRC,

---

3. The Court will hereafter refer to regulations promulgated pursuant to the HMTA as hazard-ous materials regulations, or "HMR."

and those documents are part of the record of this case. They include discovery responses in this case, as well as the administrative record of the rulemaking proceedings before the RRC on this matter. The Court has reviewed all these documents in reaching the following factual findings.

The evidence submitted by the Railroads indicates that rule 5.622 will cause an increase in the handling time of train cars carrying hazardous materials, as well as an increase in the switching of cars containing such materials. The increases would occur due to consolidation of hazardous materials on trains. The Railroads' witnesses testified that they have a limited number of cabooses available for use, and the costs incumbent in purchasing new cabooses or refurbishing unused cabooses require the Railroads to consolidate shipments of hazardous materials. By consolidating such shipments, the Railroads would minimize their need for cabooses under section 5.622. Such consolidation would also save time in adding cabooses on trains entering Texas from states which do not have a caboose requirement.[4] The RRC offered no evidence to dispute these claims by the Railroads. Rather, the RRC argued that consolidation is simply the result of managerial decisions, and is not caused by the rule. The RRC offered no evidence, however, that the decisions of the Railroads were imprudent or unnecessary. The Court is of the view that the evidence clearly demonstrates that section 5.622 will be the cause of such consolidation, and that the decisions of the Railroads to consolidate shipments are reasonable decisions brought on by the economic forces of the market in conjunction with the requirements of section 5.622.

The evidence submitted by the Railroads also indicates that consolidation will cause delays in the shipment of hazardous materials. The reason for the delays is that in order to combine cars on one train, it will sometimes be necessary to set aside cars carrying hazardous materials to await the arrival of other cars with similar loads. In addition, the adding of cabooses as trains cross into Texas will cause a delay of 20 to 30 minutes per train. Delays will also be caused by re-routing. The Santa Fe Railway Company representative testified that prudent management would require the Santa Fe to route shipments of hazardous materials around Texas, in order to avoid adding cabooses. Such re-routing would cause up to six additional hours of running time on the longer route. The RRC did not offer any evidence contradicting these statements. The Court finds that the evidence clearly supports the conclusion that the rule will cause the delays stated.

Consolidation also causes additional switching and handling of cars carrying hazardous materials. This, in turn, will be more than likely to cause an increase in accidents. As the Union Pacific official pointed out, from 67% to 76% of all accidents in Texas on the Union Pacific involving hazardous materials occurred during switching. Once again, the RRC does not challenge these figures, or the Railroads' statements that additional switching will occur under the rule, except to argue that the switching is not the result of the rule, but rather of managerial decisions. The Court is of the view that the undisputed evidence indicates that additional switching and delays will occur if section 5.622 is enacted. Moreover, there is no evidence to support the RRC's argument that section 5.622 is not the cause of the delays and switching, and the Court rejects that argument.

The question the Court must examine next is: does the fact that the rule will cause additional switching and handling of hazardous materials, as well as delays in the shipments of such materials, cause the rule to be inconsistent with the HMTA or HMR, and thus preempted under 49 U.S.C. § 1811(a)? An inconsistency determination requires the two-fold inquiry set out in *Tank Truck Carriers*. First, the Court

4. Only the states of Oregon, Montana, Virginia, and Nebraska have some sort of caboose requirement. Nebraska is phasing out cabooses, culminating in April, 1988, when no cabooses will be required. New Mexico also enacted a caboose rule, but the rule was voided by the New Mexico Supreme Court on state grounds.

must determine if compliance with both section 5.622 and the HMTA and HMR is possible. If so, the Court must then determine if the state rule is an obstacle to the accomplishment of the HMTA's and HMR's objectives. *Tank Truck Carriers*, 535 F.Supp. at 515. *See also* General Preamble to Inconsistency Rulings IR–7 through IR–15, 49 Fed.Reg. 46,632–633 (1984).

There is no serious contention that compliance with both the HMTA and HMR and the caboose rule of section 5.622 is impossible. The Railroads did not offer evidence to show that dual compliance was impossible, and thus if the rule is inconsistent with the HMTR or HMR it must be because the rule is an obstacle to the accomplishment of the objectives of the HMTA. In order to make this determination, it is necessary to examine the purposes and objectives of Congress in enacting the HMTA, and the manner in which the objectives have been carried out by the Research and Special Projects Administration (RSPA), successor to the Materials Transportation Bureau, the division of the Department of Transportation charged with implementing the HMTA and HMR.

The HMTA was enacted to deal with the fragmentation that had occurred in the supervision of the transportation of hazardous materials, and to consolidate the regulation of such transportation in one body. *Tank Truck Carriers*, 535 F.Supp. at 516. Congress' intent was "to improve the regulatory and enforcement authority of the Secretary of Transportation to protect the Nation adequately against the risks to life and property which are inherent in the transportation of hazardous materials in commerce." 49 U.S.C. § 1801 (1976). The legislative history indicates that the Congress intended to attain this goal by uniform national regulations, which would "preclude a multiplicity of State and local regulations and the potential for varying as well as conflicting regulations in the area of hazardous materials regulation." *Tank Truck Carriers*, 535 F.Supp. at 516, *citing* S.REP. NO. 1192, 93rd Cong., 2d Sess. 37 (1974). Thus, the states are limited in the regulations they may impose on the transportation of hazardous materials by the dominant authority delegated to the Department of Transportation.

In an attempt to minimize the potential for accidents during shipments, the HMTA regulations require the swift movement of such shipments. Thus, in Inconsistency Ruling 2, the RSPA stated that:

> The manifest purpose of the HMTA and the Hazardous Materials Regulations is safety in the transportation of hazardous materials. Delay in such transportation is incongruous with safe transportation. Given that the materials are hazardous and that their transport is not risk free, it is an important safety aspect of the transportation that the time between loading and unloading be minimized.

Inconsistency Ruling 2, 44 Fed.Reg. 75,566, 75,571 (1979). These remarks were echoed in Inconsistency Ruling 16:

> Since safety risks are "inherent in the transportation of hazardous materials in commerce" [49 U.S.C. § 1801], an important aspect of transportation safety is the minimization of time in transit. This objective has been incorporated in the HMR at 49 CFR 177.853, which directs highway shipments to proceed without unnecessary delay, and at 49 CFR 174.14, which directs rail shipments to be expedited within a stated time frame.

Inconsistency Ruling 16, 50 Fed.Reg. 20,872, 20,879 (1985). The courts have found state regulations to be preempted because they would cause a delay in the transportation of hazardous materials. *See, e.g., Tank Truck Carriers*, 535 F.Supp. at 517–18 (concerning highway movements).

In addition, the Department of Transportation has enacted extensive regulations governing the handling of hazardous materials. The regulations are found at 49 C.F.R. § 174.83 to 174.93 (1986). The requirements make clear the Department's view that switching of such cars must be done safely, so as to minimize accidents.

It is the Court's view that section 5.622 will stand as an obstacle to the accomplishment of the objectives of the HMTA and its regulations. The HMTA and its regulations attempt to speed the

transportation of hazardous materials and minimize the handling of such materials, in an attempt to minimize the risk of accidents. Section 5.622 thwarts this objective, as it will create delays in shipping, and extra switching and handling of materials. Thus, the rule is inconsistent with the HMTA under 49 U.S.C. § 1811(a), and is therefore preempted.

The RSPA has also found state regulations that enact more stringent requirements on certain classes of federally regulated hazardous materials to be inconsistent under 49 U.S.C. § 1811(a). For example, in Inconsistency Ruling 12 the RSPA found a regulation enacted by a New York county to be inconsistent because it set more stringent requirements on certain classes of radioactive materials than set by HMTA regulations. The RSPA noted that

> By imposing additional requirements on a subgroup of radioactive materials, St. Lawrence County has, in effect, created a new hazard class. If every jurisdiction were to assign additional requirements on the basis of independently created and variously named subgroups of radioactive materials, the resulting confusion of regulatory requirements would lead directly to the increased likelihood of reduced compliance with the HMR and subsequent decrease in public safety. As stated in IR–6:
>
>> The key to hazardous materials transportation safety is precise communication of risk. The proliferation of differing State and local systems of hazard classification is antithetical to a uniform, comprehensive system of hazardous materials transportation safety regulation. This is precisely the situation which Congress sought to preclude when it enacted the preemption provision of the HMTA [49 U.S.C. 1811]. [48 FR 764].

Inconsistency Ruling 12, 49 Fed.Reg. 46,-650, 46,651 (1984). The RSPA has stated in several rulings that it considers the federal role in the definition of hazard classes to be exclusive. *See, e.g.,* Inconsistency Ruling 5, 47 Fed.Reg. 51,991 (1982); Inconsistency Ruling 6, 48 Fed.Reg. 760 (1983); Inconsistency Ruling 8, 49 Fed.Reg. 46,637 (1984);

Inconsistency Ruling 15, 49 Fed.Reg. 46,-660 (1984). The basis for this view is well-founded. The Department of Transportation, under the authority granted it by Congress in the HMTA, has enacted an extremely technical set of regulations, occupying almost 1000 pages of the C.F.R. *See* 49 C.F.R. §§ 171–177 (1986). If state and local bodies added additional requirements based on certain hazard classes, yet another level of complexity would be added to the regulations. "Such duplication in a regulatory scheme where the Federal presence is so pervasive can only result in making compliance with the HMR less likely, with an accompanying decrease in overall public safety." 47 Fed.Reg. at 51,994.

Section 5.622 purports to require a caboose on all trains in excess of 2000 feet which are carrying a consist or residue of ten specific materials. The ten materials have two sources. Five of the classes were identified by the FRA as being of special concern in a publication entitled "Rail Hazardous Materials Movements, Region 5: Ft. Worth," dated November, 1982. The other classes were added by the RRC based upon its view that the materials pose equally significant threats. *See* 11 Tex.Reg. 2976 (1986); Affidavit of Robert S. Farnsworth at 15. The materials are referred to by "STCC codes," which refer to listings in the Standard Transportation Commodity Code Tariff STCC 6001–J. It appears that all ten categories are defined in Part 173 of 49 C.F.R.

As noted earlier, the Department of Transportation has enacted extensive regulations detailing all the requirements a shipper must follow in transporting the materials defined as hazardous in HMTA regulations. None of those regulations require the placement of a caboose on the end of a train carrying the ten classes of hazardous materials set out in section 5.622. Thus, section 5.622 adds yet another requirement for the shipment of those items. The RSPA has repeatedly held that state or local rules which add additional requirements on certain classes of hazardous materials are inconsistent with the HMTA and its regulations. *See supra* at

480. The rationale for these findings is summed up well in Inconsistency Ruling 15, where the RSPA found inconsistent a Vermont Rule placing restrictions on certain classes of radioactive materials (termed "RADWAS"):

> By imposing additional requirements on a subgroup of highway route controlled quanity radioactive material to be known as RADWAS, Vermont has created a new hazard class. If every State were to assign additional requirements on the basis of independently created and variously named subgroups of radioactive materials, the resulting confusing of regulatory requirements would lead ineluctably to the increased likelihood of reduced compliance with the HMR [a]nd subsequent decrease in public safety.

Inconsistency Ruling 15, 49 Fed.Reg. 46,-660 (1984). On this same basis, the Court is of the view that section 5.622, insofar as it purports to regulate hazardous materials, is inconsistent with the HMTA and its regulations, as it stands as an obstacle to the accomplishment of the objectives of that statute.

In summary, the Court finds that section 5.622's regulation of trains carrying hazardous materials is preempted under the HMTA for two reasons. First, it is inconsistent with the objectives of expedited movements and safe handling of hazardous materials. Second, it assigns additional requirements to certain hazard classes, in a manner inconsistent with HMTA regulations. For these reasons, that part of section 5.622 regulating hazardous materials is preempted.

 In addition, the FRSA preempts the hazardous materials portions of the rule. The FRSA provides that if "the Secretary has adopted a rule ... covering the subject matter of [a] State requirement," the State may only keep the requirement in effect if the three-prong test of the statute is met. *See* 45 U.S.C. § 434 (1986). As the Court has noted, the FRSA applies to all rules adopted by the Secretary of Transportation relating to rail safety. This includes regulations promulgated under the HMTA that relate to rail transportation.

*See supra* at 471, fn. 1. The discussion above makes it clear that the Secretary has promulgated extensive rules on the requirements necessary when transporting the ten hazardous substances specified in section 5.622. The Court is of the view, therefore, that HMTA regulations address the subject matter of the hazardous materials portions of section 5.622: the safety precautions necessary when transporting the ten substances set out in the rule. Thus, the rule is preempted unless it meets the three-prong test of section 434. The RRC had admitted that the rule is statewide in application, Defendant's Response to Request for Admission no. 1, and therefore it does not address a local safety hazard. The hazardous materials portions of the rule are therefore preempted by the FRSA as well.

### 4. *Severability*

In section III.D.2., above, the Court found that all of section 5.622 was preempted under the FRSA. The Court has also found, in the alternative, that many of the subparts of the rule are preempted independently. To summarize those findings, the Court has found that the LBIA preempts section (b) and sections (d)(2), (4) and (5). In addition, the FRSA preempts sections (d)(1) and (4) in their entirety, and that part of section (d)(2) relating to dragging equipment detectors, as well as the hazardous materials portions of the rule. Finally, the HMTA preempts that part of the rule requiring cabooses on trains over 2000 feet carrying hazardous materials or their residue. All that would remain of the rule if the Court invalidated only those portions preempted would be the general caboose requirement set in section (a), with an exception for trains under 2000 feet or operating in a yard or yard limits, allowed in section (c). In addition, the remainder of section (d) would provide an exception for trains operating on tracks with high/shifted load detectors, subpart (3), and without open top loads exceeding line clearances, subpart (6). Finally, section (e), providing for variances, would remain.

The question the Court must decide in determining whether to invalidate the entire rule, or only those parts preempted, is whether the invalid provisions are so intermingled with the remaining provisions that the intent of the regulation cannot be effected absent the invalid provisions. *United States v. Jackson,* 390 U.S. 570, 585, 88 S.Ct. 1209, 1218, 20 L.Ed.2d 138 (1968); *EEOC v. Hernando Bank, Inc.,* 724 F.2d 1188, 1190 (5th Cir.1984). As the Supreme Court recently articulated the standard:

> The standard for determining the severability of an unconstitutional provision is well established: 'Unless it is evident that the Legislature would not have enacted those provisions which are within its power, independently of that which is not, the invalid part may be dropped if what is left is fully operative as law.'

*Alaska Airlines, Inc. v. Brock,* — U.S. —, —, 107 S.Ct. 1476, 1480, 94 L.Ed.2d 661 (1987), *citing Buckley v. Voleo,* 424 U.S. 1, 108, 96 S.Ct. 612, 677, 46 L.Ed.2d 659 (1976), *quoting Champlin Refining Co. v. Corporation Comm'n of Oklahoma,* 286 U.S. 210, 234, 52 S.Ct. 559, 564, 76 L.Ed. 1062 (1932). In this case, that determination is not difficult. The *Transportation Division Memorandum and Recommendation* makes it clear that a blanket caboose rule was rejected by that division. The division plainly recommended enactment of the rule only if the exceptions in section (d) were added, and only if cabooses were required on all trains carrying hazardous materials. Moreover, the statements of the RRC in enacting the rule, *see* 11 Tex.Reg. 2974 (1986), echo these concerns. The RRC made it clear that with available technology, a blanket caboose rule was not, in its opinion, justified. The RRC also made it clear that if all the conditions of section (d) were not met, a caboose should be used. In addition, the RRC stated that its concern for the safe transportation of hazardous materials required that a caboose be placed on all trains carrying hazardous materials or their residue. The statements also reflect the RRC's view of the importance of radio communication between the caboose and the locomotive. Clearly, the intent of the RRC was to pass section 5.622 as it originally was enacted, and not to create the rule that is left after the offending portions are removed.

This view is reinforced by the statements of the RRC's counsel at the hearing on this matter. In arguing that the rule should be upheld, he stated that the RRC was attempting to be as reasonable as possible in implementing section 5.622, and attempted to incorporate the views of the Railroads that exceptions were warranted. *See* Transcript of Hearing on Motion for Preliminary Injunction at 47–48. These statements also suggest that the RRC would not have enacted what remains of section 5.622 after the preempted provisions are removed. The rule itself suggests the same result. Surely, the RRC would not have added the exceptions of section (d), or the hazardous materials requirements, if it did not view those sections as vital to the rule, as the original proposal did not contain any such exceptions or hazardous materials requirements. *See Petition Proposing Rulemaking Requiring Cabooses on Trains.*

 Because the Court is of the view that the invalid provisions are inextricably intertwined with the rest of the rule, and that the intent of the RRC would not be effected if the valid portions were left standing, the Court will strike down all of section 5.622. *Jackson,* 390 U.S. at 585, 88 S.Ct. at 1218.

## IV. CONCLUSION

The Court finds that the United States of America, acting through the Federal Railroad Administration and by the FRSA has addressed the field of cabooses on trains. Accordingly, any state action in those areas is preempted unless it meets the three-part test of 45 U.S.C. § 434. In this case, the subject rule, 16 TEX.ADMIN.CODE § 5.622, does not meet that test, and therefore it is preempted.

In addition, the Court finds that the United States of America, acting through the Federal Railroad Administration and the Material Transportation Bureau, and by

the FRSA, the LBIA and the HMTA, has wholly preempted and occupied the subject matter of locomotive equipment and has addressed the subject matter of flag protection, dragging equipment detectors, telemetry devices, and the need for special equipment on hazardous materials trains. Accordingly, any state action in the area of locomotive equipment is preempted, and specifically, 16 TEX.ADMIN.CODE § 5.622(b), (d)(2), (4) and (5) are preempted. Further, any state action in the areas of flag protection, dragging equipment detectors, telemetry devices, and hazardous materials equipment is preempted unless it meets the three-part test of 45 U.S.C. § 434. In this case, the relevant portions of the rule fail the test, and thus 16 TEX. ADMIN.CODE § 5.622(d)(1), and (4), and that part of (d)(2) concerning dragging equipment are preempted, as are the rule's requirements concerning hazardous materials. In addition, those provisions concerning hazardous materials are inconsistent with the HMTA, and preempted under 49 U.S.C. § 1811(a). Moreover, because these preempted provisions are not severable from the remainder of the rule, the entire rule must fail.

ACCORDINGLY, IT IS ORDERED that 16 TEX.ADMIN.CODE § 5.622 IS VOID AS FEDERALLY PREEMPTED.